PRESENT:  All the Justices

TRAVIS STACEY WHITEHEAD

OPINION BY
v.        Record No. 082458     JUSTICE CYNTHIA D. KINSER
                                September 18, 2009
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we hold that a positive alert on a vehicle by a trained narcotics detection dog, combined with the subsequent fruitless searches of the vehicle, the driver, and two passengers, does not provide sufficient particularized probable cause to allow a search of the only remaining passenger in the vehicle.  We will therefore reverse the judgment of the Court of Appeals holding that the search at issue did not violate the Fourth Amendment.

FACTS AND PROCEEDINGS

Around 3:00 P.M. on April 19, 2006, Officer Jay Quigley, who was employed by the City of Suffolk Police Department, stopped a vehicle for a traffic violation.  The driver and three passengers occupied the stopped vehicle; Travis Stacey Whitehead was the "rear right passenger."  Soon after the traffic stop, Officer J. B. Carr arrived on the scene with his certified narcotics detection dog, Xanto.  Officer Carr and Xanto were qualified at trial, without objection, as a "drug detection

unit" and Xanto was certified to detect the odors of marijuana, cocaine, heroin, and methamphetamine.

While the driver and the three passengers were still inside the vehicle, Officer Carr walked Xanto around the vehicle, starting at the rear on the passenger's side and proceeding to the driver's door where Xanto alerted by sitting and waiting for his reward. Xanto is trained to sit if he detects the odor of narcotics at his head height or above, and to lie down when the odor is at ground level. Officer Carr relayed to Officer Quigley the fact that Xanto had alerted on the vehicle. Other than advising the occupants that Officer Quigley would search the vehicle, Officer Carr and Xanto did not take any further action with respect to the vehicle or its occupants.

Upon learning from Officer Carr that Xanto had alerted on the vehicle, Officer Quigley directed the driver and the three passengers to exit the vehicle. He then searched the vehicle but found nothing. Officer Quigley next searched the vehicle's occupants, starting with the driver, then the front passenger, and finally the two individuals who were sitting in the back seat. The fourth and last person to be searched was Whitehead. Officer Quigley did not find any narcotics during his search of the first three occupants. However, when he searched Whitehead, Officer Quigley discovered what he described as "two syringes in [Whitehead's] right front pants pocket [and] in the same pocket

2

was a paper towel [with] a beer bottle cap wrapped up in it." According to Officer Quigley, the bottle cap had "a burnt residue inside of it." Based on his training and experience, Officer Quigley believed that the residue was heroin. Subsequent forensic analysis of the bottle cap confirmed the residue was in fact heroin.

Whitehead was subsequently indicted for possession of "a Schedule I or II controlled substance, in violation of" Code § 18.2-250. As the case proceeded in the Circuit Court of the City of Suffolk, Whitehead filed a motion to suppress the evidence found on his person. At a hearing on the motion to suppress, Whitehead conceded that the alert by the narcotics detection dog on the vehicle gave the police officer probable cause to search the vehicle. However, Whitehead argued that the officer did not have probable cause to search the occupants of the vehicle "without some sort of individualized probable cause" as to each person.

With regard to Xanto's alert on the vehicle, the following information was elicited during Officer Carr's cross-examination by Whitehead's attorney:

> Q. [Defense Counsel:] [Xanto has] been trained to [detect] the odor of narcotics?
>
> A. [Officer Carr:] Yes, sir.
>
> Q. Now, that doesn't always mean that there are narcotics strongly in the vehicle; is that correct?

3

A. That's correct.

Q. Sometimes there may be an old odor or something like that?

A. Yes, sir.

Q. But there is nothing found?

A. Correct.

. . . .

Q. And when he searched the car - or the locations he alerts on, does that actually mean that that's the location of the drugs?

A. No. That's where he gets the odor from.

Q. Which means it's just where he's got the best airflow?

A. Yes, sir.

The circuit court denied Whitehead's motion to suppress, stating in its letter opinion:

> I conclude, first, that the alert by the drug dog constituted probable cause to search the vehicle. When that search yielded no drugs, and the searches of the driver and two other passengers likewise yielded no drugs, I conclude that the arresting officer then had particularized probable cause to search the defendant, whether he had been arrested or not.

Whitehead subsequently entered a conditional guilty plea reserving his right to challenge on appeal the circuit court's denial of his motion to suppress. The circuit court found Whitehead guilty of the charged offense and sentenced him to five years incarceration, with three years and two months suspended.

4

The Court of Appeals of Virginia, in a published opinion, held that the circuit court did not err in denying the motion to suppress and thus affirmed Whitehead's conviction. Whitehead v. Commonwealth, 53 Va. App. 1, 7, 668 S.E.2d 435, 438 (2008). The Court of Appeals concluded that, "[e]ven if we assume arguendo that a trained dog's detection of the scent of drugs coming from an occupied car does not, of itself, provide sufficiently particularized probable cause to search each of the car's occupants for drugs, . . . on these facts . . . the search of Whitehead's person did not violate the Fourth Amendment." Id. at 5, 668 S.E.2d at 436-37. Continuing, the Court of Appeals stated:

> In this case, the officers had probable cause to search the car following Xanto's alert. And, by the time the officers searched Whitehead, they had probable cause to search his person through the process of elimination. Each fruitless search – of the car and of the other occupants of the car – increased the likelihood that Whitehead possessed the odorous contraband detected by Xanto's trained nose. While it may have been more a result of luck rather than a profound understanding of the Fourth Amendment, we hold that by the time the officers searched Whitehead they possessed the necessary probable cause to justify the search.

Id. at 7, 668 S.E.2d at 438 (footnote omitted).[1]

---

[1] The Court of Appeals also concluded that Whitehead lacked standing to challenge the searches of the first, second, and third occupants of the vehicle and therefore refused to address Whitehead's argument that the court should ignore those previous fruitless searches in deciding whether probable cause existed to search him. The Court of Appeals stated that it "assess[es] the

5

We granted Whitehead this appeal. In his sole assignment of error, Whitehead asserts the Court of Appeals erred in holding that the search of his person did not violate the Fourth Amendment.

DISCUSSION

On appeal, Whitehead does not challenge the lawfulness of the traffic stop or the fact that the police officer had probable cause to search the vehicle based on the positive alert by the narcotics detection dog. See Jones v. Commonwealth, 277 Va. 171, 180, 670 S.E.2d 727, 732 (2009) (a positive alert from a narcotics detection dog establishes probable cause to search a vehicle). Thus, the only issue in this case is whether, after the search of the vehicle and three of its four occupants revealed no contraband, the police officer then had probable cause to search Whitehead.[2]

The appellate standard of review applicable in this case is well settled:

---

existence of probable cause at the time the search [is] conducted." Whitehead, 53 Va. App. at 7 n.3, 668 S.E.2d at 438 n.3.

[2] As Whitehead correctly notes, a search of his person was justified only as a search incident to a custodial arrest. See United States v. Robinson, 414 U.S. 218, 236 (1973) (search incident to a custodial arrest does not violate the Fourth Amendment). Thus, the actual question is whether probable cause existed to arrest Whitehead. See United States v. Di Re, 332 U.S. 581, 587 (1948) (determining whether defendant was lawfully arrested since ensuing search was permissible if probable cause to arrest existed).

6

In reviewing the denial of a motion to suppress evidence claiming a violation of a person's Fourth Amendment rights, we consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial. The burden is on the defendant to show that the trial court committed reversible error. We are bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence. We will review the trial court's application of the law de novo.

Malbrough v. Commonwealth, 275 Va. 163, 168-69, 655 S.E.2d 1, 3 (2008); accord Murphy v. Commonwealth, 264 Va. 568, 573, 570 S.E.2d 836, 838 (2002).

Relying on the rationale of the Court of Appeals, the Commonwealth argues that by the time the police officer searched Whitehead, the officer had the necessary probable cause to justify that search. Whitehead, however, asserts the positive alert by the narcotics detection dog provided probable cause to search only the vehicle and that there were no facts particularized as to him to establish probable cause that he was engaged in criminal activity. Our analysis of the issue before us is guided by the decisions of the Supreme Court of the United States in United States v. Di Re, 332 U.S. 581 (1948), Ybarra v. Illinois, 444 U.S. 85 (1979), and Maryland v. Pringle, 540 U.S. 366 (2003), and this Court's decision in El-Amin v. Commonwealth, 269 Va. 15, 607 S.E.2d 115 (2005).

In Di Re, an informant named Reed told an investigator that he was to buy "counterfeit gasoline ration coupons" from an

7

individual named Buttitta at a particular location.  332 U.S. at 583.  The investigator and a detective followed Buttitta's vehicle until it arrived at the appointed place.  Id.  The officers proceeded to the vehicle and found Reed, the only occupant of the rear seat, holding two gasoline ration coupons, which later proved to be counterfeit.  Id.  Reed stated he had obtained the coupons from Buttitta, who was sitting in the driver's seat.  Id.  Michael Di Re was sitting in the front seat beside Buttitta.  Id.  All three were taken into custody, frisked for weapons, and transported to the police station.  Id. At the police station, Di Re complied with a request to empty the contents of his pockets.  Id.  Upon doing so, Di Re pulled out two gasoline and several fuel oil ration coupons.  Id.  Di Re was subsequently "booked" and another search at that time revealed one hundred gas ration coupons.  All the coupons in Di Re's possession were counterfeit.  Id.

The Government argued the search of Di Re was "justified as incident to a lawful arrest" or, in the alternative, that the "search of his person was justified as incident to search of a vehicle reasonably believed to be carrying contraband."  Id. at 583-84.  The Supreme Court initially considered the second ground and assumed without deciding, since the vehicle was not searched, that there was probable cause to search the vehicle. The Court then held:

8

> We see no ground for expanding the ruling in
> [Carroll v. United States, 267 U.S. 132 (1925)] to
> justify this arrest and search as incident to the
> search of a car.  We are not convinced that a person,
> by mere presence in a suspected car, loses immunities
> from search of his person to which he would otherwise
> be entitled.

Id. at 586-87.

Since the Government also defended the search on the basis that it was incident to a lawful arrest, the Court then determined whether there was probable cause to arrest Di Re and search his person incident to that arrest.  Noting the Government conceded that the only person who committed a possible misdemeanor in the open presence of the officer was Reed, and that the police had acquired previous information as to Buttitta's selling coupons to Reed but had no such information as to Di Re, the Court concluded that Di Re's presence was not enough to justify the arrest.  Id. at 592.  The Court also rejected the Government's reliance on a conspiracy to show probable cause to arrest Di Re.  Id. at 593.  The Court stated that

> whatever suspicion might result from Di Re's mere
> presence seems diminished, if not destroyed, when
> Reed, present as the informer, pointed out Buttitta,
> and Buttitta only, as a guilty party.  No reason
> appears to doubt that Reed willingly would involve Di
> Re if the nature of the transaction permitted.  Yet he
> did not incriminate Di Re.  Any inference that
> everyone on the scene of a crime is a party to it must
> disappear if the Government informer singles out the
> guilty person.

9

Id. at 594.

In Ybarra, several police officers executed a warrant authorizing the search of a particular tavern and its bartender. 444 U.S. at 88. Upon entering the tavern, the officers informed all those present that they were going to conduct a "cursory search for weapons." Id. One of the officers proceeded to pat down each of the customers, including Ventura Ybarra. Id. Although the officer felt what he described as "a cigarette pack with objects in it," he did not remove the pack from Ybarra's pocket. Id. Instead, he proceeded to pat down other customers. Id. Several minutes later, the officer returned to Ybarra and frisked him once again, relocating and retrieving the cigarette pack. Id. at 89. Inside the pack the officer found six foil packets containing a substance that later proved to be heroin. Id. The trial court denied Ybarra's motion to suppress the evidence found during the search of his person because the search was justified under an Illinois statute.[3] Id.

The Supreme Court, in reviewing the case, first noted that the complaint for the search warrant did not allege that persons illegally purchasing drugs frequented the bar, nor did it even

_____

[3] "An Illinois statute authorize[d] law enforcement officers to detain and search any person found on premises being searched pursuant to a search warrant, to protect themselves from attack or to prevent the disposal or concealment of anything described in the warrant." Ybarra, 444 U.S. at 87.

10

so much as mention the patrons of the tavern.  Id. at 90.  The Court concluded that "[n]ot only was probable cause to search Ybarra absent at the time the warrant was issued, it was still absent when the police executed the warrant" because the police "had no reason to believe that he had committed, was committing, or was about to commit any offense under state or federal law." Id. at 90-91.  According to the Court, "Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers."  Id. at 91.  Thus, the Court found that "the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale."  Id.

The Court further explained:

It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed.  But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.  Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.  This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.  The Fourth and Fourteenth

11

Amendments protect the legitimate expectations of privacy of persons, not places.

> Each patron who walked into [the tavern] was clothed with constitutional protection against an unreasonable search or an unreasonable seizure. That individualized protection was separate and distinct from [that] protection possessed by the proprietor of the tavern or by [the bartender]. Although the search warrant, issued upon probable cause, gave the officers authority to search the premises and to search [the bartender], it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers.

Id. at 91-92 (footnotes, citations, and internal quotation marks omitted).

The Court also rejected the State's argument that the first pat down of Ybarra, permissible as a Terry frisk, provided justification for the second search that uncovered the heroin. The Court held, "[t]he initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a pat down of a person for weapons." Id. at 92-93 (footnote omitted).

In Pringle, a police officer stopped a vehicle for speeding. 540 U.S. at 368. Three occupants were in the vehicle: the driver, who was also the owner of the vehicle; Pringle, the front-seat passenger; and the back-seat passenger. Id. When the driver opened the glove compartment to retrieve his registration, the officer observed a large amount of rolled-

12

up cash. Id. During a consensual search of the vehicle, the police officer retrieved $763 from the glove compartment and "five plastic glassine baggies containing cocaine from behind the back-seat armrest." Id. After none of the occupants of the vehicle would provide information about the ownership of the contraband, the officer arrested all three individuals and transported them to the police station. Id. at 368-69.

Pringle, while in custody and after waiving his Miranda rights, admitted that the cocaine belonged to him and claimed the other occupants did not know about the drugs. Id. at 369. The trial court denied Pringle's motion to suppress these statements as the fruit of an illegal arrest, holding that the officer had probable cause to arrest Pringle. Id. On review before the Supreme Court, it was uncontested that the officer, upon recovering the five plastic baggies containing suspected cocaine, had probable cause to believe a felony had been committed. Id. at 370. Thus, "[t]he sole question [was] whether the officer had probable cause to believe that Pringle committed that crime." Id. In deciding that question, the Court stated:

> We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly.

13

Id. at 372.

The Court distinguished its holding in Ybarra, explaining:

> Pringle and his two companions were in a relatively small automobile, not a public tavern. [We have] noted that "a car passenger – unlike the unwitting tavern patron in Ybarra – will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing."  Here we think it was reasonable for the officer to infer a common enterprise among the three men.  The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

Id. at 373 (quoting Wyoming v. Houghton, 526 U.S. 295, 304-05 (1999) (citations omitted)).  The Court also noted that, unlike the situation in Di Re when the informant singled out the guilty person, none of the three men singled out any one of them with respect to the ownership of the cocaine or money.  Id. at 374.

Finally, in this Court's decision in El-Amin, we upheld the constitutionality of a frisk for weapons based on an officer's reasonable and particularized suspicion that El-Amin was armed and dangerous.  269 Va. at 23, 607 S.E.2d at 119.  There, police officers received an anonymous tip that six young black males were at a specified location smoking marijuana.  Id. at 18, 607 S.E.2d at 116.  Two officers responded, and although they observed no signs of criminal activity, they approached four young black males walking near the identified location and asked to speak with them.  Id.  Two of the men walked over to the

14

police officers, but El-Amin and the fourth individual remained further back and separate from each other. Id. Two other police officers then arrived on the scene, and one of them, Officer Williams, "immediately observed the fourth individual turn away and shove his hands into his waistband." Id. Officer Williams directed the fourth individual to turn around and face him, but that individual did not comply. Id. So, Officer Williams conducted a pat down search of the fourth individual. Id. When the officer felt what he believed was a gun, he yelled "gun." Id. Officer Williams found a pellet gun in the fourth individual's waistband. Id.

Upon hearing Officer Williams yell "gun," another officer conducted a pat down search of El-Amin and found a .38-caliber revolver. Id. The officer then arrested El-Amin for illegal possession of a firearm as a juvenile, searched him incident to the arrest, and found marijuana and cocaine in his pockets. Id.

El-Amin contended that the officer had no particularized suspicion to believe he was engaged in criminal activity or that he was a danger to the officer and, therefore, "the search and seizure, based solely on El-Amin's association or physical proximity to the other three youths, was unconstitutional." Id. at 19-20, 607 S.E.2d at 117. The Commonwealth argued that the legitimate concern for officer safety justified the pat down at issue and that, under those circumstances, particularized

15

suspicion was not required.  Id. at 21, 607 S.E.2d at 118.  The Commonwealth urged the Court to adopt a rule in such cases that "approves the search of the companion of a person validly detained based solely on the status of companion."  Id.

This Court declined to adopt such a per se rule.  Id. Nevertheless, we concluded that the officer's concern for his and the other officers' safety was warranted because the encounter took place in the evening in a high crime area and the four individuals appeared to be in a group.  Id. at 22, 607 S.E.2d at 118.  Continuing, we held:

> [U]pon learning that the fourth individual had a hand gun, [the police officer] was warranted in inferring that the inherent tendency toward violence demonstrated by one group member carrying a gun raised reasonable and particularized safety concerns as to other members of the same group.  The circumstances in this case support the officer's objectively reasonable apprehension that, upon discovery of a weapon on the person of one member of the group, the other members of the group might also be armed and dangerous.

Id. at 23, 607 S.E.2d at 119.

> In reaching this conclusion, we emphasized
>
> that El-Amin's companionship status alone was [not] sufficient to authorize a pat down search [and] that an officer's generalized concern for his safety alone would [not] validate such a search under the Fourth Amendment.  The totality of the facts in this case – place, time, discovery of a weapon, and group activity – validates the pat down search under the principles utilized by the Supreme Court when considering Fourth Amendment challenges to searches and seizures.

Id.  We also distinguished Ybarra, stating:

16

> *Ybarra* is not dispositive here because in *Ybarra* the officers did not consider the patron and bartender as part of a group, the officers had no reason to believe that they were subject to any particular danger from any of the patrons in the bar, and simply told all patrons that they were conducting a cursory search for weapons.

*Id.* at 22 n.5, 607 S.E.2d at 118 n.5 (internal quotation marks omitted).

The United States Supreme Court's decisions in *Di Re* and *Ybarra* demonstrate that probable cause to arrest and/or search an individual must be particularized to that individual; mere proximity to criminal activity alone is insufficient to establish probable cause. However, as illustrated by the decision in *Pringle*, evidence showing a common criminal enterprise can provide the necessary link between criminal activity and an individual so as to establish probable cause sufficiently particularized to that individual. Although *El-Amin* involved a frisk for weapons based on the lesser standard of reasonable articulable suspicion, see *Bass v. Commonwealth*, 259 Va. 470, 475, 525 S.E.2d 921, 923 (2000) (recognizing that the standard of "reasonable suspicion" requires a lesser showing than the standard of "probable cause"), this Court nevertheless required something more than El-Amin's mere companionship status. Instead, we considered the totality of the circumstances, i.e., "place, time, discovery of a weapon, and group activity," and concluded that sufficient particularized

17

safety concerns existed as to El-Amin and the other members of the group to justify the frisk for weapons. El-Amin, 269 Va. at 23, 607 S.E.2d at 119.

In the case at bar, viewing the evidence in the light most favorable to the Commonwealth, we hold that probable cause to search Whitehead was absent. After the positive alert by the trained narcotics detection dog, Officer Quigley unquestionably had probable cause to search the vehicle. See Jones, 277 Va. at 180, 670 S.E.2d at 732. However, without something more, the positive alert did not provide probable cause sufficiently particularized as to Whitehead to allow the search of his person. In contrast to the situation in Pringle, the Commonwealth presented no evidence, other than Whitehead's status as a passenger in the vehicle, indicating that Whitehead and the other passengers were involved in any common enterprise involving criminal activity. There also was no evidence indicating Whitehead individually was committing, had committed, or was about to commit a criminal offense. See Di Re, 332 U.S. at 594 (informant singled out guilty individual).

The Commonwealth, however, argues that Xanto's positive alert indicated that contraband was present somewhere, and after no contraband was found in the vehicle or on the other three occupants, that somewhere had to be on Whitehead's person. Based on the evidence in this record, we are unwilling to draw

18

such a conclusion. While the fruitless searches of the vehicle and the other occupants increased the likelihood that the contraband detected by Xanto was on Whitehead's person, it also increased the likelihood that the dog alerted to the odor of contraband no longer present in the vehicle. Officer Carr testified at the suppression hearing that a positive alert by Xanto did not necessarily mean that drugs were currently present in the automobile; rather, Xanto could have alerted to an "old odor."

The positive alert by Xanto and the subsequent fruitless searches of the vehicle and three of its occupants may have created a strong suspicion that contraband was present on Whitehead's person; however, probable cause requires more than a strong suspicion. See Jones, 277 Va. at 178, 670 S.E.2d at 731 ("[P]robable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting United States v. Grubbs, 547 U.S. 90, 95 (2006) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983))). Based on the record in this case, the positive alert and the fruitless searches were not sufficient to establish probable cause particularized as to Whitehead that he was concealing contraband on his person. Evidence of other factors such as those present in Pringle or El-Amin was needed to establish the requisite probable cause. See State v. Voichahoske, 709 N.W.2d

19

659, 671 (Neb. 2006) (finding that a positive canine alert on a vehicle and subsequent fruitless search of the vehicle, <u>combined</u> with evidence of complicity in concealing the identity of the driver of the vehicle, provided probable cause particularized to the passenger that he was concealing drugs on his person); <u>see also</u> <u>State v. Gibson</u>, 108 P.3d 424, 430 (Idaho Ct. App. 2005) ("Probable cause to believe that drugs are located in an automobile may not automatically constitute probable cause to arrest all persons located in the vehicle; some additional factors would generally have to be present, indicating to the officer that those persons possessed the contraband."); <u>People v. Fondia</u>, 740 N.E.2d 839, 843 (Ill. App. Ct. 2000) ("'A canine alert on the exterior of the vehicle supports the general proposition that drugs may well be located within the vehicle, but not the more specific proposition that the drugs are concealed on a particular occupant thereof.'" (quoting <u>Woodbury v. Florida</u>, 730 So. 2d 354, 359 (Fla. Dist. Ct. App. 1999) (Harris, J., dissenting))); <u>State v. Wallace</u>, 812 A.2d 291, 302-03 (Md. 2002) (holding that a positive canine alert on a vehicle, without any other indicia of possession of contraband specifically related to the passenger, is insufficient to establish probable cause to search a non-owner, non-driver of the vehicle). But see <u>United States v. Anchondo</u>, 156 F.3d 1043, 1045 (10th Cir. 1998) (holding that a positive canine alert

20

provides probable cause to arrest the driver of the vehicle and finding that a fruitless search of the vehicle made it more likely that the contraband was on the bodies of the driver and passenger); State v. Ofori, 906 A.2d 1089, 1099 (Md. Ct. Spec. App. 2006) ("Because of the close association between contraband in a vehicle and the driver of (or other passenger in) the vehicle, either finding the drugs in the vehicle, as in Pringle, or probable cause to believe that they are in the vehicle, as in this case, necessarily implicates the driver and passengers.").

                            CONCLUSION

For these reasons, we conclude the search of Whitehead's person violated his Fourth Amendment rights.  The Court of Appeals erred by holding otherwise.  Because the evidence seized from Whitehead should have been suppressed, there would be insufficient evidence to sustain a conviction on retrial. Accordingly, we will reverse the judgment of the Court of Appeals, vacate Whitehead's conviction, and dismiss the indictment.  See Jackson v. Commonwealth, 267 Va. 666, 681, 594 S.E.2d 595, 603 (2004).

                                        Reversed and dismissed.

21